# IN THE SUPREME COURT OF IOWA

No. 09–0905

Filed July 8, 2011

**ANNETT HOLDINGS, INC.,**

>   Appellant,

vs.

**KUM & GO, L.C.,**

>   Appellee.

---

Appeal from the Iowa District Court for Polk County, Joel D. Novak, Judge.

Annett Holdings, Inc. appeals the district court's grant of summary judgment dismissing its negligence and third-party beneficiary contract claims against Kum & Go, L.C. **AFFIRMED.**

Bruce E. Johnson and James M. Ballard of Cutler Law Firm, P.C., West Des Moines, for appellant.

Michael A. Dee and Haley R. Van Loon of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellee.

**MANSFIELD, Justice.**

A dishonest employee of a trucking company put money in his pocket while claiming to be buying fuel for his fellow employees. This fraud was perpetrated at a truck stop, where the employee used his company credit card to obtain cash while reporting purchases of fuel. The truck stop paid out the cash, accepting the employee's bogus explanation that the money was for other employees' fuel purchases, and was reimbursed pursuant to its contract with the card issuer. The card issuer in turn was reimbursed under a separate contract with the trucking company's parent. After the fraud had been ongoing for several years, it was discovered, and the employee was arrested and convicted of theft.

The trucking company's parent now seeks to reverse the contractual flow of dollars by suing the truck stop both for negligence and as an alleged third-party beneficiary of the contract between the card issuer and the truck stop. We agree with the district court that the economic loss rule bars the negligence claim and that the trucking company's parent was not a third-party beneficiary of the contract between the card issuer and the truck stop. Accordingly, we affirm the summary judgment granted to the truck stop below.

## I. Background Facts and Proceedings.

Annett Holdings, Inc. is an Iowa holding company. One of its subsidiaries is TMC Transportation, a trucking company that employed Michael Vititoe as a shag driver at the Clow Valve plant in Oskaloosa. Vititoe's duties as a shag driver consisted of moving empty and loaded semi-tractor trailers within the yard of the Clow Valve plant, facilitating the loading and unloading of trailers, and facilitating the transportation of Clow Valve products by other TMC drivers to outside destinations.

TMC provided Vititoe a truck along with a Comdata credit card to purchase fuel for the truck.

Annett and Comdata had a written agreement. Under the agreement, Comdata provided cards that could be used by authorized Annett employees to purchase fuel and obtain cash advances at any Comdata authorized service center locations. Annett agreed to accept full responsibility for all purchases made with those cards and also to be "fully responsible for the unauthorized or fraudulent use thereof until such time as Comdata has received such notification from [Annett] provided that each fraud or misuse is not attributed to Comdata." Annett also agreed to "hold Comdata harmless from any and all liability resulting from the acts of any employees or agents of [Annett] which acts shall include but are not limited to negligent acts of such persons." A separate schedule, signed by both parties, clarified that the Annett/Comdata agreement extended to Annett's TMC subsidiary.

Comdata in turn had a written contract with Kum & Go, L.C. that enabled a particular Kum & Go store in Oskaloosa to handle Comdata transactions. The agreement provided that this Kum & Go service center would lease a Comdata terminal for $80 per month, which would then be utilized for Comdata card transactions. Comdata would reimburse Kum & Go for those transactions after deducting certain fees. The agreement contained detailed procedures that Kum & Go promised to follow in processing Comdata transactions. The Comdata/Kum & Go agreement was governed by Tennessee law.

From November 2002 to April 2006, while Vititoe was employed by TMC, he went to the Kum & Go in Oskaloosa on an almost daily basis. Store personnel allowed Vititoe to operate the Comdata terminal himself. Vititoe managed to steal money by entering fuel purchases on the

Comdata machine and submitting cash advance slips printed out by the machine to the store clerks—who then paid Vititoe in cash. Kum & Go personnel wondered why Vititoe was getting cash back while reporting fuel purchases. He claimed he was doing so because he was a "regional supervisor" and needed cash to pay for other employees' fuel purchases because the other employees did not have cards of their own.

Vititoe's Comdata transactions were reported, reviewed, and validated daily by TMC's fuel manager. For reasons that are not clear, the pre-March 2006 fuel manager never noticed (or at least never did anything about) Vititoe's suspicious activity. In March 2006, a new fuel manager took over. Almost immediately, he noticed Vititoe's pattern of "buying" fuel every day, even on weekends when he was supposedly not working and despite the fact Vititoe was only a local shag driver.

On April 10, 2006, a TMC employee followed Vititoe and observed him using the Comdata card, but not putting any gas in his truck. The police were contacted, and they interviewed Vititoe, who admitted he had stolen money from his employer by misusing the gas card. Vititoe was arrested and charged with first-degree theft. He was subsequently convicted of theft, sentenced to one month incarceration, and ordered to pay restitution of $298,524.79.

Annett filed a petition against Kum & Go alleging, among other theories, negligence and breach of contract for the monetary losses it suffered through Vititoe's theft. Annett's negligence theory asserted that Kum & Go was negligent in providing cash to Vititoe and that Vititoe did not have actual or apparent authority to receive cash back on Comdata transactions. In its breach of contract claim, Annett alleged it was an intended third-party beneficiary of the contract between Kum & Go and

Comdata, and Kum & Go had breached the terms of the contract by failing to comply with its procedures.

Kum & Go moved for summary judgment. Kum & Go argued it could not be liable in negligence due to the "economic loss rule" and because it owed no duty to Annett. Kum & Go also denied Annett was a third-party beneficiary of its contract with Comdata.

The district court granted summary judgment to Kum & Go. It found the negligence claim barred by the economic loss rule. It rejected the breach of contract claim on the ground that Annett was not an intended beneficiary of the Comdata/Kum & Go contract. Annett appeals.

## II. Standard of Review.

The district court disposed of the case on summary judgment. We review rulings on summary judgment motions for errors at law. *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). "We examine the record to determine whether a material fact is in dispute and, if not, whether the district court properly applied the law." *Id.*

## III. Analysis.

**A. Economic Loss Rule.** In this case, Annett seeks to recover an economic loss. No one was injured; no property was damaged or destroyed. Rather, Vititoe made unauthorized withdrawals of cash that were charged to Comdata and ultimately to Annett. Annett now claims that Kum & Go was negligent in failing to prevent this unauthorized activity, which resulted, indirectly, in economic losses to Annett.

Notably, Annett had entered into a contract with the card provider, Comdata, which in turn had entered into a contract with Kum & Go. In the contract with Comdata, Annett assumed responsibility for unauthorized or fraudulent use of Comdata cards by its own employees.

Annett does not dispute that this contract bars it from recovering against Comdata, but seeks now to recover in tort from the remote party with which Comdata contracted—Kum & Go.

We are unaware of a parallel to this claim in our reported case law, but other appellate courts have recently addressed and rejected similar claims. In *Cumis Insurance Society, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36 (Mass. 2009), the Massachusetts Supreme Judicial Court considered claims brought by credit unions and their insurer against a retailer (BJ's) that had improperly stored credit card data in a manner that allowed thieves to access the data, resulting in fraudulent use of the credit cards. The credit unions and their insurer had to absorb the losses from the fraudulent use, so they sued BJ's, alleging that its negligence and its failure to follow the express terms of its own agreement with its merchant bank had enabled this criminal activity. *Cumis*, 918 N.E.2d at 39–40. The court found the economic loss rule barred the negligence claims, rejecting the plaintiffs' attempt to overcome that rule by arguing that tangible personal property damage (in addition to economic loss) was involved because the compromised credit cards had to be replaced and reissued. *Id.* at 46–47; *accord Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 176–77, 179–80 (3d Cir. 2008) (reaching the same result in a case filed against BJ's under Pennsylvania law); *see also Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 213–14 (3d Cir. 2010) (holding that Pennsylvania law barred a credit card account holder from suing a bank for negligently allowing the holder's personal assistant to misappropriate over $1 million through fraudulent transactions); *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 498–99 (1st Cir. 2009) (applying Massachusetts law); *Huggins v. Citibank, N.A.*, 585 S.E.2d 275, 276–77 (S.C. 2003) (holding an individual could

not bring a negligence claim against credit card issuer for negligently issuing a card to a person who had stolen the individual's identity).[1]

As a general proposition, the economic loss rule bars recovery in negligence when the plaintiff has suffered only economic loss. *Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 126 (Iowa 1984). In *Nebraska Innkeepers*, we acknowledged "[t]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Id.* (citing *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 309, 48 S. Ct. 134, 135, 72 L. Ed. 290, 292 (1927)).

*Robins*, an admiralty decision authored by Justice Holmes, is perhaps the first noteworthy decision on the economic loss rule, but it is not the starting-point of the doctrine. *See* Restatement (Second) of Torts § 766C, reporter's note and cross references through December 1977 (1981), *available at* http://www.westlaw.com (citing various pre-*Robins* cases). As one commentator has said:

> For well over a century, it has been a settled feature of American and English tort law that in a variety of situations there is no recovery in negligence for pure economic loss, that is, for economic loss unrelated to injury to the person or the property of the plaintiff.

Peter Benson, *The Problem with Pure Economic Loss*, 60 S.C. L. Rev. 823, 823 (2009).

---

[1]In *In re Hannaford Bros. Co. Customer Data Security Breach Litigation*, 613 F. Supp. 2d 108, 126–28 (D. Me. 2009), a federal district court sitting in Maine ruled that grocery store customers could sue a grocery store owner for alleged negligence in handling their electronic payment data. *Hannaford* rests on a view that the economic loss doctrine in Maine is limited to situations where an alleged defect in a product causes damage to the product itself. *Id.* at 127–28. We believe *Hannaford* is inconsistent with Iowa law, since *Hannaford* recognizes general negligence recovery for pure economic loss even when parties are in contractual privity.

This rule is partly intended to prevent the "Death of Contract," *see* Grant Gilmore, The Death of Contract (2d ed. 1995), or the tortification of contract law. When two parties have a contractual relationship, the economic loss rule prevents one party from bringing a negligence action against the other over the first party's defeated expectations—a subject matter the parties can be presumed to have allocated between themselves in their contract. *See Determan v. Johnson*, 613 N.W.2d 259, 262–63 (Iowa 2000) (claim by home buyer against home sellers); *Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 125 (Iowa 1988) (claim by butcher against manufacturer of a defective meat curing agent); *see also Audio Odyssey, Ltd. v. United States*, 373 F.3d 870, 872–73 (8th Cir. 2004) (applying Iowa law) (claim by borrower against loan guarantor). This is sometimes referred to as "the contractual economic loss rule." *See* Dan B. Dobbs, *An Introduction to Non-Statutory Economic Loss Claims*, 48 Ariz. L. Rev. 713, 723 (2006) [hereinafter Dobbs]. Courts reason that when a party enters into a contract, that document should control the party's rights and duties. *Id.*

But the doctrine is by no means limited to the situation where the plaintiff and the defendant are in direct contractual privity. For example, in *Nebraska Innkeepers*, plaintiffs sought recovery from a bridge contractor for purely economic loss that occurred when the bridge had to be closed because of the contractor's negligence. 345 N.W.2d at 128–29. This is an example of what is sometimes called "the stranger economic loss rule." *See* Dobbs, 48 Ariz. L. Rev. at 715. This aspect of the economic loss rule has several underlying justifications. In a complex society such as ours, economic reverberations travel quickly and widely, resulting in potentially limitless liability. As Professor Dobbs puts it,

"Stand-alone economic loss often spreads without limit." *Id.* Also, the rule encourages parties to enter into contracts. *Id.* at 716–17.

Another case where this court applied "the stranger economic loss" rule, although without so describing it, is *Anderson Plasterers v. Meinecke,* 543 N.W.2d 612, 613 (Iowa 1996). There, two workers were injured by a negligent third party. The employer sued the third party for its economic losses, e.g., loss of the workers' time and the expense of hiring replacement workers. We refused to recognize the claim. *Id.* at 613–14. Likewise, in *State ex rel. Miller v. Philip Morris Inc.,* 577 N.W.2d 401, 406–07 (Iowa 1998), we held the State could not recover certain economic losses (i.e., Medicaid expenses) it had incurred because of smoking-related illnesses allegedly caused by the defendant tobacco companies.

The economic loss rule is subject to qualifications. For example, purely economic losses are recoverable in actions asserting claims of professional negligence against attorneys and accountants. *Van Sickle Constr. Co. v. Wachovia Commercial Mortg.,* 783 N.W.2d 684, 692 n.5 (Iowa 2010). Also, negligent misrepresentation claims fall outside the scope of the economic loss rule. *Id.* at 694. In addition, when the duty of care arises out of a principal-agent relationship, economic losses may be recoverable. *Langwith v. Am. Nat'l Gen. Ins. Co.,* 793 N.W.2d 215, 222 (Iowa 2010).

We need not attempt to delineate the precise contours of the economic loss rule in Iowa. For present purposes, it is enough for us to note that Annett's cause of action bears a number of characteristics that bring it within the scope of the economic loss rule. The claim does not fall under any of the recognized exceptions or qualifications to the economic loss rule. *See id.*; *Van Sickle Constr. Co.,* 783 N.W.2d at 692

n.5.  It is a remote economic loss claim, similar in that respect to the claims we rejected in *Nebraska Innkeepers*, *Anderson Plasterers*, and *Philip Morris*, but with the additional twist that this case does not even involve an *initial* personal injury or damage to property.

Also, although Annett did not have a direct contractual relationship with Kum & Go, it had a contract with Comdata which in turn had contracted with Kum & Go.  When parties enter into a chain of contracts, even if the two parties at issue have not actually entered into an agreement with each other, courts have applied the "contractual economic loss rule" to bar tort claims for economic loss, on the theory that tort law should not supplant a consensual network of contracts. *See* Dobbs, 48 Ariz. L. Rev. at 726; Mark P. Gergen, *The Ambit of Negligence Liability for Pure Economic Loss*, 48 Ariz. L. Rev. 749, 764–65 (2006) [hereinafter Gergen] (noting that liability has been precluded when the claimant could have obtained redress for the harm from the actor by contract with the actor "or through a chain of contracts reaching back to the actor").[2]

An illustration of this principle is *Richards v. Midland Brick Sales Co., Inc.*, 551 N.W.2d 649, 650–52 (Iowa Ct. App. 1996), in which the court of appeals found that the economic loss rule barred a tort claim by a homeowner against a brick supplier.  The homeowner there had contracted with a builder, which in turn had contracted with the brick supplier. *Richards*, 551 N.W.2d at 650.  Similarly, in *Tomka v. Hoechst*

---

[2]Professor Gergen, building on the work of another scholar (Professor Jane Stapleton), describes two general criteria to determine when an actor is not subject to negligence liability for pure economic loss: (1) negligence liability would expose an actor to a risk of indeterminate liability; and (2) other mechanisms (e.g., contract law) exist to regulate the actor's unreasonable conduct or to prevent or redress the harm.  Gergen, 48 Ariz. L. Rev. at 763–65.  In a big picture sense, these two categories resemble Professor Dobbs's two categories of "stranger economic loss" and "contractual economic loss."

*Celanese Corp.*, 528 N.W.2d 103, 106–07 (Iowa 1995), we rejected economic loss claims by a cattle feeder against a manufacturer of synthetic growth hormones, even though the feeder had no contract with the manufacturer, having purchased the hormones through local veterinarians.

Here Annett agreed with Comdata that it would be "fully responsible" for the fraudulent or unauthorized use of credit cards. Annett knew that Comdata would be entering into agreements with service centers, that Comdata would be reimbursing service centers for charges made to the credit cards, and that Comdata would in turn expect reimbursement from Annett. Also, Annett had the capacity to prevent fraudulent or unauthorized use by its employee: Its subsidiary TMC received a daily report of Vititoe's transactions, and as soon as a new fuel manager took over, that person noticed the suspicious activity immediately. It is difficult to see why a tort remedy is needed here. Annett contracted to assume certain risks of financial loss and had the ability to minimize those risks.

Even a recent critic of some applications of the economic loss rule concedes the doctrine can be applied when the plaintiff is in a contractual chain of distribution leading to the defendant. *See* Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 556–57 (2009) ("[A] purchaser seeking purely economic losses should not be permitted to complain, under tort principles, against anyone in the chain of distribution that the product bought was not better . . . than what the plaintiff bargained for under the law of contract. . . . With respect to purely economic loss, it is ordinarily fair to bind the plaintiff by the terms of the agreement to which the plaintiff assented.") The chain of contracts here involved services rather

than a product, but that does not compel a different result. *Robins* itself concerned two linked service agreements. In *Robins*, a group of individuals had chartered a ship from its owner which in turn contracted with a dry dock for repair of the ship. When negligent repairs at some point resulted in damage to the ship and losses to the charterers, they sued the dry dock. *Robins*, 275 U.S. at 307, 48 S. Ct. at 134, 72 L. Ed at 292. The U.S. Supreme Court denied relief. *Id.* at 308–10, 48 S. Ct. at 135–36, 72 L. Ed. at 292–93. As Justice Holmes explained, "The law does not spread its protection so far." *Id.* at 309, 48 S. Ct. at 135, 72 L. Ed. at 292.

We cited *Robins* with approval in *Nebraska Innkeepers*. 345 N.W.2d at 126. As noted above, we summarized the rule in broad terms. *Id.* We did not confine the economic loss rule to situations where the defendant was supplying a product. *See also Audio Odyssey*, 373 F.3d at 872–73 (applying Iowa's economic loss rule to a service relationship).

Additionally, in *Determan* and *Nelson*, we announced a series of factors to be considered in applying the economic loss rule. We focused on " 'the nature of the defect, the type of risk, and the manner in which the injury arose' " as well as "the type of damages that the plaintiff seeks to recover." *Determan*, 613 N.W.2d at 263 (quoting *Nelson*, 426 N.W.2d at 124). Those cases involved product defect claims in which there had been some physical consequences—i.e., a sagging roof in *Determan* and spoiled meat in *Nelson.* It is not clear to us that the *Determan/Nelson* factors are relevant when the claim is for negligence resulting only in financial harm. But in any event, those factors favor the application of the economic loss rule here. There was no risk of physical harm; there was no "defect"; and the "injury" (loss of money) occurred gradually and over a long period of time.

Annett tries to analogize this case to *Waukon Auto Supply v. Farmers & Merchants Savings Bank*, 440 N.W.2d 844 (Iowa 1989) and *Phariss v. Eddy*, 478 N.W.2d 848 (Iowa Ct. App. 1991), but we find the comparison unpersuasive. In those cases, banks that cashed checks and handed out funds based on forged or unauthorized endorsements were found liable to the actual payees of those checks. However, the liability in those cases was based on *conversion* under Article 3 of the Uniform Commercial Code, not negligence. *Waukon Auto Supply*, 440 N.W.2d at 849; *Phariss*, 478 N.W.2d at 851. If anything, those decisions provide another justification for the application of the economic loss rule here. If parties could simply bring negligence claims whenever financial transactions went awry, there would be little need for the elaborate payment system rules set forth in Articles 3 and 4 of the U.C.C.

Lastly, as we noted earlier, this claim resembles tort claims that have been rejected recently by state and federal appellate courts in Massachusetts and Pennsylvania. No persuasive reason has been offered for us to depart from those decisions here in Iowa. Accordingly, we affirm the grant of summary judgment to Kum & Go on Annett's negligence claim, and now turn to its third-party beneficiary claim.[3]

---

[3]In our view, it does not advance the analysis to assert that Kum & Go owed an "independent duty" to Annett to use ordinary care. This rephrases the question, but does not answer it. We have said "the existence of a duty is a policy decision, based on the relevant circumstances, that the law should protect a particular person from a particular type of harm." *Van Essen v. McCormick Enters. Co.*, 599 N.W.2d 716, 719 (Iowa 1999). The economic loss rule says, in effect, under some circumstances, a party does not owe a duty to another party to protect it from pure economic losses. Whether the issue is framed in terms of the economic loss rule or the scope of an actor's duty, we still need to make the underlying determination whether tort law affords a potential remedy.

At a minimum, before one can claim the existence of an "independent duty" running from Kum & Go to Annett, it is necessary to identify the source of that duty. The federal district court decision in *Hannaford* does not help in that regard. The court there found a duty based on an implied contract between the grocery store customer

**B. Third-Party Beneficiary Claim.** In the alternative, Annett claims it was a third-party beneficiary of the contract between Comdata and Kum & Go. That contract had a Tennessee choice-of-law provision. Both parties therefore agree that Annett's claim to third-party beneficiary status is governed by Tennessee law.

Under Tennessee law, "contracts are presumed to be 'executed for the benefit of the parties thereto and not third persons.' " *Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.,* 59 S.W.3d 63, 68 (Tenn. 2001) (quoting *Oman Constr. Co. v. Tenn. Cent. Ry.,* 370 S.W.2d 563, 572 (Tenn. 1963)). Tennessee follows the general rule that a third party must be an "intended beneficiary" of a contract to have the right to enforce it. *Id.* There must be " 'the clear intent to have the contract operate for the benefit of a third party.' " *Id.* at 68–69 (quoting *First Tenn. Bank Nat'l Ass'n v. Thoroughbred Motor Cars, Inc.*, 932 S.W.2d 928, 930 (Tenn. Ct. App. 1996)).[4]

In the *Owner-Operator* case, the Tennessee Supreme Court held that individual credit card holders were not third-party beneficiaries with the right to enforce contracts between the card issuers and merchants prohibiting surcharges on credit card transactions. *Id.* at 65. We believe the reasoning of that decision controls here. Here, as in the *Owner-Operator* case, the agreement did not expressly provide that there would be no third-party beneficiaries, but there was an anti-assignment provision, which in the Tennessee court's view tended to weigh against a

_____

and the grocery store. 613 F. Supp. 2d at 118–19. There was no contract between Kum & Go and Annett.

[4]Tennessee, like Iowa, follows the third-party beneficiary principles set forth in the Restatement (Second) of Contracts. *See* Restatement (Second) of Contracts § 302, at 439–40 (1981); *see also RPC Liquidation v. Iowa Dep't of Transp.*, 717 N.W.2d 317, 319–20 (Iowa 2006); *Owner-Operator Indep. Drivers Ass'n,* 59 S.W.3d at 69–70.

finding of third-party beneficiary status. *Id.* at 71. Also, while the contract between Comdata and Kum & Go imposed detailed processing requirements on Kum & Go, it did not indicate those requirements were to benefit Annett; rather, they appear from the contract simply intended to protect Comdata. *Id.* at 73 (noting terms of contract made clear card issuer's intent was to maximize its own profits, not to confer benefits on third-party beneficiaries).

As the district court pointed out, the intent to benefit Comdata rather than third parties is made manifest by the structure and wording of the agreement. Subsections 4(a) and 4(b) set forth the processing requirements. Subsection 4(c) then provides that Comdata shall have the "right to refuse" or (having accepted) to reverse any transaction where those requirements were not followed. This stands as an explicit statement that the intended beneficiary of subsections 4(a) and 4(b) is Comdata and not anyone else. As the district court explained:

> Such language evinces Comdata's intent to reserve the right to enforce the transaction procedures itself, and as a necessary corollary, the right to determine when a service center has failed to appropriately follow the transaction procedures. To allow a third party to make its own determination as to when a service center has failed to abide by the procedures, and to further attempt to enforce said procedures in a court of law, would be contrary to the intent of the parties under the contract.

We agree with the district court's views on this matter.

**IV. Conclusion.**

For the reasons stated herein, we affirm the district court's order granting summary judgment to Kum & Go.

**AFFIRMED.**

All justices concur except Wiggins and Hecht, JJ., who dissent, and Appel, J., who takes no part.

#09–0905, *Annett Holdings, Inc. v. Kum & Go, L.C.*

**WIGGINS, Justice (dissenting).**

I dissent. While I agree with the majority that Annett Holdings, Inc. was not a third-party beneficiary, I cannot support the conclusion that we should bar its claim because of the economic loss rule. To understand the basis for my dissent, I believe it is first necessary to review the development of the economic loss rule in Iowa.

Iowa appeared to adopt the economic loss rule in *Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124 (Iowa 1984). There, a group of Nebraska business owners sued Pittsburgh-Des Moines for purely economic loss due to negligence of Pittsburgh-Des Moines in the construction of a bridge over the Missouri River connecting Iowa and Nebraska. *Neb. Innkeepers, Inc.*, 345 N.W.2d at 125–26. After reviewing cases with similar facts from other jurisdictions, this court barred the claims of the business owners. *Id.* at 126–28.

My review of the cases relied on by this court, when it decided *Nebraska Innkeepers*, is that in an action in which a bridge is negligently damaged, the courts generally relied on the theory that economic damages resulting from damage to the bridge are too remote to allow a recovery. *See Leadfree Enters., Inc. v. U.S. Steel Corp.*, 711 F.2d 805, 807 (7th Cir. 1983) (" '[E]ven where the chain of causation is complete and direct, recovery may sometimes be denied on grounds of public policy because: (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too

likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point' ") (quoting *Hartridge v. State Farm Mut. Auto. Ins. Co.*, 271 N.W.2d 598, 602 (Wis. 1978)); *Petitions of Kinsman Transit Co.*, 388 F.2d 821, 825 (2d Cir. 1968) ("Under all the circumstances of this case, we hold that the connection between the defendants' negligence and the claimants' damages is too tenuous and remote to permit recovery."); *In re Complaint of Marine Navigation Sulphur Carriers, Inc.*, 507 F. Supp. 205, 209 (E.D. Va. 1980) ("Inherent in the concept of proximate or legal cause is the recognized need to limit the compensability of indirect and remote consequences of the negligent act."); *Gen. Foods Corp. v. United States*, 448 F. Supp. 111, 113 (D. Md. 1978) ("Courts which have addressed this issue have repeatedly expressed concern that a contrary rule would open the door to virtually limitless suits, often of a highly speculative and remote nature."); *Rickards v. Sun Oil Co.*, 41 A.2d 267, 270 (N.J. Sup. Ct. 1945) ("It is obvious that the alleged wrong was not the natural and proximate result of defendant's negligence, and the defendant is not liable."). In other words, these authorities hold as a matter of law any damages caused by the defendant's negligence in damaging the bridge is not the proximate cause of the plaintiff's damages. In reality, we did not adopt the economic loss rule. We applied the proximate-cause-remoteness doctrine and called it the economic loss rule.

A few years later, this court refined its position on pure economic loss claims. *Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 122–25 (Iowa 1988). The court applied the economic loss rule to a product liability case, but did so using a different rationale. *Id.* The *Nelson* court quoted with approval the following analysis suggested by a federal court of appeals in deciding whether a particular claim is cognizable in tort or contract:

"The line between tort and contract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to a particular claim."

*Id.* at 124–25 (quoting *Pa. Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1173 (3d Cir.1981)). Whereafter, our court stated:

We agree that the line to be drawn is one between tort and contract rather than between physical harm and economic loss. . . . When, as here, the loss relates to a consumer or user's disappointed expectations due to deterioration, internal breakdown or non-accidental cause, the remedy lies in contract.

Tort theory, on the other hand, is generally appropriate when the harm is a sudden or dangerous occurrence, frequently involving some violence or collision with external objects, resulting from a genuine hazard in the nature of the product defect.

*Nelson,* 426 N.W.2d at 125. Thus, the court abandoned its former proximate cause rationale in favor of a tort–contract analysis. This analysis is particularly fact intensive and the outcome is contingent on the nature of the claim.

We reaffirmed the tort–contract analysis in *Tomka v. Hoechst Celanese Corp.,* 528 N.W.2d 103 (Iowa 1995). The *Tomka* court found the damages sustained by the plaintiff clearly fell within contract theory, not tort theory. *Tomka,* 528 N.W.2d at 107. The *Tomka* court held, " 'defects of suitability and quality are redressed through contract actions and safety hazards through tort actions.' " *Id.* (quoting *Northridge Co. v. W.R. Grace & Co.,* 471 N.W.2d 179, 185 (Wis. 1991)).

In 1999 this court again applied the tort–contract analysis in a products liability case. *Am. Fire & Cas. Co. v. Ford Motor Co.,* 588 N.W.2d 437, 438 (Iowa 1999). In *American Fire and Casualty,* the court

determined the economic loss rule would not preclude a product liability suit brought by the automobile owner's insurer, as subrogee, against the manufacturer seeking recovery for the loss of an automobile when the automobile spontaneously caught fire. *Id.* at 439–40. This court held the manner in which the injury occurred sounded more like a tort action than a contract action; therefore, the economic loss rule would not bar recovery by the insurer. *Id.*

In 2000 this court utilized the tort–contract analysis to determine that a purchaser of a home could not recover on a negligence theory against the seller for purely economic loss. *Determan v. Johnson*, 613 N.W.2d 259, 264 (Iowa 2000). In making this determination, the court applied the factors enumerated in *Nelson*. *Id.* at 263. The court looked at the nature of the defect, the type of risk, and manner in which the injury arose. *Id.* Relying on the nature of the claim the court reasoned the "plaintiff's claim is based on her unfulfilled expectations with respect to the quality of the home she purchased. Accordingly, her remedy lies in contract law, not tort law." *Id.* Thus, the court found the action sought the benefit of the bargain rather than a tort remedy. *Id.* at 264.

Most recently, in 2010, this court revisited the economic loss rule and held the rule did not preclude a buyer's tort claim of negligent misrepresentation. *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 693 (Iowa 2010). Here too, the court reached its conclusion by examining the nature of the claim. *Id.* The court reaffirmed the purpose behind the rule—"to prevent litigant with contract claims from litigating them inappropriately as tort claims." *Id.*

In addition to product liability claims that result from sudden and dangerous injuries and claims based on negligent misrepresentation, this court has not applied the economic loss rule in cases of professional

negligence. This court has allowed clients to sue their attorney for negligence and collect purely economic loss despite the economic loss rule. *See Crookham v. Riley*, 584 N.W.2d 258, 265–66 (Iowa 1998); *Pickens, Barnes & Abernathy v. Heasley*, 328 N.W.2d 524, 526–27 (Iowa 1983). The same is true for suits against accountants. *See Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 221 (Iowa 1998).

*Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S. Ct. 134, 72 L. Ed. 290 (1927), is widely regarded as the landmark decision in this area. After *Robins*, courts have applied the economic loss rule in a variety of cases using multiple rationales and justifications. Peter Benson, *The Problem with Pure Economic Loss*, 60 S.C. L. Rev. 823, 823–38 (2009) [hereinafter Benson]. At the very core of the rule is the idea that it serves as a boundary line between two areas of law—contract law, which rests on a bargained-for obligation between limited and immediately identifiable parties, versus tort law, grounded in legal obligations imposed on the greater population generally. In most cases, one of these two areas of the law will allow an aggrieved party a cause of action. In some circumstances, however, neither will. This circumstance gives us the opportunity to design a framework under which exceptions to the economic loss rule may be considered.

The common thread running through all our prior cases is that we apply the economic loss rule in a mechanical fashion. We look at the facts and the nature of the lawsuit to determine if the plaintiff is attempting to litigate a contract claim as a tort claim. *Van Sickle Constr. Co.*, 783 N.W.2d at 693. In making this determination, we consider whether the plaintiff suffered an injury, or was merely disappointed in his or her expectation. In the event a party suffered only economic loss, we may allow a claim but not before further inquiry. This inquiry

requires us to determine if the economic loss sustained was *sudden and dangerous* as in *American Fire & Casualty* or simply an *unfulfilled expectation* as in *Determan.*

As far back as 1958, courts have contemplated circumstances that give rise to exceptions to the economic loss rule. *Biakanja v. Irving*, 320 P.2d 16, 18–19 (Cal. 1958). In *Biakanja* a notary public negligently failed to have a will property executed resulting in a pure economic loss to the plaintiff. *Id.* at 17. Because of the closeness of the defendant's conduct and the injury suffered, the court reasoned that it was fair and just to allow the plaintiff to recover damages. *Id.* at 19. The primary focus of the court was the "end and aim" of the transaction. *Id.* at 18–19.

In 1979 the California Supreme Court revisited the exception to the economic loss rule. *J'Aire Corp. v. Gregory*, 598 P.2d 60, 61 (Cal. 1979). Here, the court allowed recovery of pure economic damages when a restaurant owner suffered losses due to the negligence of a contractor performing work on a building the restaurant owner was leasing. *Id.* at 66. As in *Biakanja,* the court reasoned that the special relationship of the parties created an independent duty on the part of the defendant to perform the work diligently and with consideration to the tenants. *Id.* at 63–65.

In *People Express Airlines, Inc. v. Consolidated Rail Corporation*, 495 A.2d 107 (N.J. 1985), the plaintiff's airline terminal was forced to shut down when ethylene oxide escaped from a tank car necessitating evacuation of the surrounding area. *People Express Airlines, Inc.*, 495 A.2d at 108. Without any property damage or physical injury, the court allowed People Express to recover its pure economic loss. *Id.* at 109, 118. The court reasoned that pure economic losses should not be borne by innocent victims. *Id.* at 111.

Commentators have also opined that a strict mechanical application of the economic loss rule may not be possible and that exceptions to the rule are necessary. *See generally* Benson, 60 S.C. L. Rev. at 823–38; Herbert Bernstein, *Civil Liability for Pure Economic Loss Under American Tort Law*, 46 Am. J. Comp. L. 111, 126–31 (1998). After first adopting and applying the economic loss rule, this court has also acknowledged there may be circumstances giving rise to a cause of action for purely economic loss arising from an independent duty outside the world of contract law and beyond tort law. I believe the economic loss rule should remain generally, with exceptions based upon the nature of the action.[5] This case presents one of those exceptions.

In examining the cause of action in the present case, it is clear to me that Annett Holdings is not trying to circumvent a contract claim by bringing a tort claim. Allowing the claim against Kum & Go to proceed will not result in a flood of litigation, speculative damages, or thwart any of the other rationales commonly asserted in association with the economic loss rule. I reach this conclusion for a number of reasons.

First, Annett could not bring a contract claim against Kum & Go. Annett did not have any contractual relationship with Kum & Go. Therefore, there is not a contractual remedy available to Annett to redress this alleged wrong. Moreover, without a contractual relationship, Annett was unable to allocate the risk of loss if Kum & Go was negligent in its processing of the purchases. As one commenter pointed out:

> With respect to the boundary-line function of the economic loss rule, decisions holding that third-party claims are not foreclosed by the rule make sense. If there is no agreement

---

[5]It should be noted that many foreign common law jurisdictions have substantially revised, or have done away with, similar doctrines. *See generally* Karen Hogg, *Negligence and Economic Loss in England, Australia, Canada, and New Zealand*, 43, Int'l & Comp. L.Q. 116 (1994).

between the parties to a lawsuit, there is no risk that recognizing tort obligations will violate the parties' freedom to contract, because there never was an effort to exercise such freedom. If the parties are not in privity, contract law does not potentially afford a remedy, except in the relatively rare case of a third-party beneficiary. Thus, respect for contract principles and private ordering does not require that the economic loss rule bar the claims of persons not standing in a contractual relationship. The purpose of the economic loss rule is not to leave injured persons remediless for economic losses but to ensure respect for private ordering by relegating a plaintiff to contract remedies in cases where there is an agreement between the parties allocating economic risks. If there is no contract between the parties to litigation, there is no boundary-line function to be performed by the economic loss rule.

Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 555 (2009) (footnotes omitted).

Courts in Minnesota and Colorado have agreed with this rationale. *See Russo v. NCS Pearson, Inc.,* 462 F. Supp. 2d 981, 1001 (D. Minn. 2006) ("[I]t strikes the Court as unfair to hold . . ., as a matter of law, that Plaintiffs lack a tort remedy because the alleged tort arose in the context of the performance of a contract to which they were strangers."); *A.C. Excavating v. Yacht Club II Homeowners Ass'n,* 114 P.3d 862, 870 (Colo. 2005) ("[S]ubcontractors [had] assumed contractual obligations with the developer and general contractor[;] these obligations did not and could not relieve the subcontractors of their independent duty to act without negligence in constructing the development.").

Second, Kum & Go actions did not accompany the sale or creation of a product. Kum & Go was providing a service just as an attorney or an accountant does for their client. In performing this service, Kum & Go had an independent duty to use ordinary care in the processing of the purchases made with the Annett's credit card. *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.,* 613 F. Supp. 2d 108, 119 (D. Me. 2009). Negligence means failure to use ordinary care. *Mescher v.*

*Brogan*, 223 Iowa 573, 574, 272 N.W. 645, 646 (1937). Ordinary care is the care which a reasonably careful person would use under similar circumstances. *Id.* Therefore, negligence is "doing something a reasonably careful person would not do under similar circumstances, or failing to do something a reasonably careful person would do under similar circumstances." *Bartlett v. Chebuhar*, 479 N.W.2d 321, 322 (Iowa 1992) (quoting 1 Iowa Civil Jury Instructions 700.2 (1987)). Annet had expectation that Kum & Go would process these transactions in a nonnegligent manner.

In the summary judgment record there is a genuine issue of material fact as to whether Kum & Go was negligent in the processing of the credit card transactions. The breach of the duty to use ordinary care in the processing of the purchases made with Annett's credit cards is independent of any contractual duty. In Iowa, courts recognized that under some circumstances, a breach of a contractual duty may give rise to an independent action in tort. *Preferred Mktg. Assocs. Co. v. Hawkeye Nat'l Life Ins. Co.*, 452 N.W.2d 389, 397 (Iowa 1990). It seems incongruous to me that this court will allow independent tort actions in situations where a breach of a contractual duty gives rise to an independent tort, but will not allow such an action where an independent duty exists and there is no contract between the parties.

Finally, if you examine the basis of the claim, Annett is not making a claim for an injury to a product. Annett is claiming that Kum & Go was negligent in the processing of the credit card transactions. Kum & Go had a duty independent of a statute to operate and oversee the use of the credit cards. Historically, our cases involving the economic loss rule focus on a fact situation where the defendant sells a product that fails to perform as expected. *See Determan*, 613 N.W.2d at 260 (involving the

sale of a home); *Am. Fire & Cas. Co.*, 588 N.W.2d at 438 (involving the sale of a vehicle); *Tomka*, 528 N.W.2d at 105 (involving the sale of veterinarian drug products); *Nelson*, 426 N.W.2d at 121 (involving the sale of a meat-curing product). Obviously, Annett's claims arise from transactions that were vastly different from those presented in our prior cases. The facts of this case are akin to a legal or accounting malpractice case.

This distinction was recognized by a federal district court in Maine when it held under Maine law the economic loss rule will not be extended to a situation where a merchant failed to use ordinary care in processing a credit card transaction. *In re Hannaford Bros.*, 613 F. Supp. 2d at 127–28. There, the plaintiffs alleged a grocery store failed to exercise ordinary care in processing a credit card transaction, causing the cardholder to suffer purely economic loss. *Id.* at 115–16. The facts of *In re Hannaford Bros.* are similar to the facts of this case.

The court reviewed Maine law and determined the Maine courts established the economic loss rule to prevent a purchaser from receiving expectation damages in connection with the purchase of a product. *Id.* at 127–28. In Maine, these types of damages are better left to be litigated under express and implied warranty theories. *Id.* Our court used this same rationale when it applied the economic loss rule in *Determan, Tomka*, and *Nelson.* The court also used this rationale when it rejected the economic loss rule in *American Fire and Casualty.* Annett's action in this case does not involve the sale of a product or expectation damages; therefore, there is no logical reason to apply the economic loss rule in this case.

In summary, I would not apply the economic loss rule mechanically. I would look at the nature of the action, the breach of the

duty alleged, and the damages sought before I would allow the economic loss rule to bar a claim. I agree the economic loss rule should preclude recovery when the parties are in privity with the attendant opportunity to allocate the risk of loss, and no independent duty is established, because any damages incurred could have been covered by an agreement negotiated between the parties. It makes no sense to hold parties not in privity to the same standard, where a duty to process credit card transactions in a reasonable manner exists. The purpose of the rule is to prevent contract claims from being litigated as tort claims. There are no contract claims available to Annett under the facts of this case. Hence, the purpose of the economic loss rule is not frustrated by applying it under these narrow facts. Accordingly, I would reverse the district court's order granting Kum & Go's motion for summary judgment.

Hecht, J., joins this dissent.