# IN THE COURT OF APPEALS OF IOWA

No. 23-0104
Filed July 3, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**NATHEN WAYNE CAMERON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dallas County, Thomas P. Murphy, Judge.

A defendant appeals his convictions and sentences for assault causing serious injury and domestic abuse assault causing bodily injury. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Olivia D. Brooks, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Tabor and Greer, JJ., but decided by Tabor, P.J., Greer, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**GREER, Judge.**

"Ur done," "m hurting you," "m fucking you up," "m getting even tonight,' "You will regret everything," "I promise," "I will ruin u and I do not care": Nathen Cameron sent these messages and more to his girlfriend, Trisha, the same night that Trisha fell from the balcony of their third-story apartment and sustained injuries that ultimately led to her death. From this incident, a jury found Cameron guilty of domestic abuse assault causing bodily injury and assault causing serious injury. On appeal, Cameron challenges the sufficiency of the evidence concerning his conviction and sentence for assault causing serious injury, asserting that his words and actions did not cause a serious injury. Next, involving both convictions, Cameron asserts the district court abused its discretion in admitting expert testimony on domestic abuse dynamics. Finally, concerning his sentences, Cameron maintains the district court abused its discretion in considering that Cameron did not accept responsibility for his actions when he believed his description of his role to the court conformed with the jury findings.

## I. Background Facts and Prior Proceedings.

Cameron and Trisha were in a relationship for nearly four years and living together in the same apartment for a year before the night of her fall. That night, beginning in the early evening, they exchanged numerous text messages. Cameron sent Trisha messages stating, "Be the victim ur gonna learn what it is. I am done," "U play victim," and—multiple times—just the word "Victim." Trisha responded at various intervals: "I DIDN'T DO SHIT TO YOU," "Not playing games," "Not sitting by myself on a Saturday night," and "u were gone for 5 hours . . . AND YOU STILL AREN'T HOME."

Cameron had left the apartment building and arrived at a bar at 5:31 p.m. Thirteen minutes later, he left the bar and went to a friend's apartment. He sent his friend a message stating that Trisha was "playing victim and shit," and he stopped in a second bar around 8:00 p.m. and had a shot of whiskey. Between 7:57 p.m. and 8:52 p.m., Trisha called Cameron twelve times. Cameron did not answer any of the calls. Around 9:13 p.m., she left the apartment and met friends at a different bar than where Cameron was. At 10:18 p.m., Cameron called Trisha, she answered, and the two spoke for thirty-seven seconds. Around 10:38 p.m., Cameron arrived back at the apartment building and parked his car. Two minutes later, Trisha got out of a rideshare in front of the apartment building and walked inside. Two minutes after that, Cameron got out of his car and went inside. For the next twelve minutes or so, Cameron and Trisha were the only people in their apartment. The downstairs neighbor heard a male voice arguing, a loud crash, and what he believed was a heavy item being dragged inside of Trisha and Cameron's apartment.

At 10:54 p.m., Cameron and his dog walked outside of the apartment building. At 10:57 p.m., he called a friend on Snapchat and spoke with him for twenty-four seconds. Seven minutes after exiting the apartment building, at 11:01 p.m., Cameron called 911 from Trisha's phone. During the 911 call, he told the dispatcher "my girlfriend just like, we were arguing and she just jumped off the fucking balcony, bro. . . . She just jumped off the fucking balcony. And she's bleeding, bro. She's bleeding." He added that the balcony was on the third floor of the apartment building, and "she's like response—like, not responsive, but I know she's still awake." Cameron cried and at times broke off from responding to

questions, including failing to answer whether Trisha was breathing; he hung up on the dispatcher.

West Des Moines police officers arrived within five minutes. Officer Jacob Sutton went to the area behind the apartment building beneath the balcony, where Cameron was kneeling next to Trisha. She was lying flat on her back with her legs straight out. Officer Sutton observed a softball-sized pool of blood where he believed Trisha had landed and noticed she had dirt and leaves on her front; because of the dirt and leaves and their location, he believed her body had been moved or rolled after landing. He also saw blood on Trisha's left knee and injuries on the tops of her feet. After finding a faint pulse but no signs of breathing, Officer Sutton and Officer Sydney Corbin began performing cardiopulmonary resuscitation (CPR) on Trisha. Emergency medical technicians arrived shortly after law enforcement, took over CPR, and transported Trisha via ambulance to a hospital.

Officers Sutton and Jacob Belay spoke to Cameron, who told them that Trisha jumped off the balcony and he "didn't do shit to her." He further explained that he and Trisha were having a "disagreement" that evening because "shit wasn't ok," but he had not been with her. He added that he "just watched [his] fucking girlfriend jump off of a third story balcony." He saw her walk on the balcony before that but thought that she was going out for a smoke or to get some fresh air to calm down. While Cameron was speaking with officers, he made several phone calls to his friends from his cell phone. Law enforcement seized the phone as evidence and detained him; Cameron joked that he had six cell phones on him but did not hand over Trisha's cell phone. Law enforcement described Cameron's emotions

during these interactions as up and down and described him as combative. Cameron was not taken into custody by law enforcement; he went from the apartment to a third bar where he continued using Trisha's phone. He asked the bartender if he could use the bartender's phone to log into Snapchat to delete some things, but she told him no.

Cameron called Trisha's parents from Trisha's phone and told them that Trisha had jumped off the balcony. He also said that the police were going to think that he was responsible. Her parents went to the hospital, where Trisha was on a ventilator and unconscious. Her mother noticed a rug burn on Trisha's arm, that one of her knees was swollen, her fingernails were broken, a toe was bleeding, and she had spots around her face. Doctors determined that because of the severe head and spinal cord injuries that Trisha suffered, she was brain dead and would not recover; there was nothing that they could do to help her. The trauma surgeon noted the same injuries as Trisha's mother and found the combination of laceration on Trisha's feet and knees with the trauma to her head odd. Trisha died after her family discontinued life-sustaining treatment.

When law enforcement executed a search warrant on the apartment, they found the glass sliding door and the screen door to the balcony closed. The blind that covered the doorway to the balcony was pulled down, to the point that someone would have to duck underneath it to go out onto the balcony. Law enforcement also found a ding in the hallway wall, an indent in a bedroom wall, hair along the doorframe of the glass sliding door and the bottom of the fourth-floor balcony, scratches in the bedroom door frame, and blood splatters on the bedroom wall. The edge of the second-floor balcony—the balcony underneath Trisha and

Cameron's—was damaged. Law enforcement seized a set of golf clubs; the head of the driver had a dent on the back side, which did not match that of a golf ball. All of the text messages exchanged between Cameron and Trisha had been deleted from his phone, but detectives recovered them by extracting data from Cameron's phone. Detectives measured the apartment and found that the distance from the railing on the third-floor balcony to the ground was twenty-three and one-half feet.

Cameron gave the police Trisha's cell phone two days after Trisha died. He also consented to an interview with Detectives Jason Hatcher and Gabby Gitzen. Cameron told them that the night that Trisha fell, he went to see his uncle around 6:00 p.m. He got home around 8:00 or 9:00 p.m., but Trisha had left. After she got home, they were arguing, and he went into the bathroom. He heard the sliding door open, came out of the bathroom and heard Trisha scream, and then saw her fall. He claimed that he sprinted down to her and called 911 immediately. He surmised that maybe Trisha had tried to climb down from the balcony and slipped. When Detective Hatcher asked Cameron how long he thought he and Trisha were together before she jumped, he said "ten to thirty minutes. I don't know, dude. I don't know." In response to Detective Gitzen's question whether anything got physical, Cameron said, "No . . . . She threw something across the room, but that's about it." He clarified that she threw her computers. He also added that "it was an altercation in the apartment" and "we were yelling at each other, the neighbors maybe could hear that."

The State charged Cameron with and tried him for first-degree murder, a class "A" felony, in violation of Iowa Code sections 707.1 and 707.2 (2022);

domestic abuse assault by strangulation resulting in bodily injury, a class "D" felony, in violation of sections 236.2(2), 708.1, and 708.2A(5); and willful injury causing serious injury, a class "C" felony, in violation of section 708.4(1).

At trial, the trauma surgeon who treated Trisha testified that most people who die by suicidal falls "jump and they land on their feet or their—you know, their hands and feet. They don't usually land on the back of their head." The surgeon believed that Trisha's broken kneecap was not caused by the fall, and she reported those concerns to the medical examiner. The medical examiner testified, and the State offered and the court admitted his autopsy report into evidence. The autopsy report contained the medical examiner's determination that "[s]ome of the blunt force injuries sustained by [Trisha] are inconsistent with a simple fall, such as: the patellar fracture, abrasions on the dorsal feet, and the abrasion on the anterior right forearm." The medical examiner believed that the broken kneecap was not caused by the fall. While he listed the cause of death as injuries to the head and neck, the medical examiner opined that "[g]iven the unclear circumstances compounded by the unexplained injuries the manner of death is left as undetermined." Trisha had a blood alcohol concentration of 0.081 and cocaine in her system when a blood sample was taken around 11:44 p.m. the night of the fall. However, according to testimony at trial, the cocaine was metabolized to the point that Trisha would have no longer been high at the time the sample was taken. The medical examiner explained that "[u]sually in suicidal falls, decedents tend to either jump and land on their feet or they dive and land on the top of their head." He did not see injuries associated with a suicidal fall here.

Also at trial, the State called Jodi Bowden-Fuentes, a domestic violence program coordinator. Although Cameron objected to her testimony, the court ruled it was admissible, explaining, "I do think there's an aspect in this case that makes this testimony relevant because the parties were in a domestic relationship. There was also, regardless of whether willful injury is merged, a domestic abuse count." Bowden-Fuentes testified that she had never met Cameron or Trisha and did not know anything about this case in particular, but she generally described that "[a]ny resistance by [a domestic violence victim] is met with swift and harsh consequences" with physical assault as "the most recognized" swift consequence. On cross-examination, Bowden-Fuentes reiterated that she did not know Trisha or Cameron, their families, or anything about their social life, their physical or mental health, their financial situation, or their religion.

A friend of Cameron's testified that the golf club with the dent was originally his and that he had dented it while swinging and hitting a golf ball backwards. A forensic nurse testified via prerecorded video. She stated that she reviewed photos, the medical examiner's autopsy report, and medical records of Trisha. From those documents, she concluded that that bruising around Trisha's eyes— petechiae—was the result of CPR, loss of oxygen, and the trauma to the back of her head, but not due to strangulation. However, she conceded that she had not performed or attended any autopsies and had not attended Trisha's. She also had not spoken to Cameron or any of the medical personnel who treated Trisha before she died. A forensic pathologist also testified that he reviewed the medical examiner's autopsy report, Trisha's medical records, the 911 call, interviews of Cameron, and photographs and reports from law enforcement. He concluded that

the injury to Trisha's kneecap could have come from the fall and that all her injuries were consistent with a fall from a third-story balcony. He also testified that the injuries were consistent with a suicide, an accidental fall, or a homicidal act.

Cameron testified on his own behalf. He denied that he and Trisha were fighting on the day of her fall. However, he interpreted her text messages as accusing him of cheating on her, and he admitted he "clearly did not react well" to that accusation. He threatened to leave the relationship but insisted that he did not threaten to kill her. When he arrived back at the apartment around 10:44 p.m., he went into the bathroom and smoked marijuana. He came out of the bathroom, saw Trisha drinking vodka straight from the bottle, poured the vodka down the sink, and went back into the bathroom. He heard the sliding door to the balcony open and saw her step onto the balcony. While he was still in the bathroom, he "kind of heard—[he] just heard, 'Aah.' She just yelled, like, 'Aah.' . . . And [he] went on the balcony, and [he] just looked over it, and [he] just saw her. . . . [J]ust saw her laying on her back on the ground below [their] balcony." He found her "on her back. Her leg was folded up underneath her." When asked why he deleted the text message exchange with Trisha, he said that he "just didn't want people to see the way [they] were talking to each other. So [he] just deleted the messages." He insisted that he did not know for certain what happened, stating, "The only thing that I know for certain is that I didn't have anything to do with it. But I don't know." He denied assaulting Trisha, strangling her, hitting her with a golf club, throwing her off the balcony, laying a finger on her, moving her body, or killing her. On cross-examination, however, he claimed that he unfolded her leg from underneath her before law enforcement arrived.

The jury acquitted Cameron of first-degree murder, finding him guilty of the lesser-included charge of assault causing serious injury, a class "D" felony, and domestic abuse assault causing bodily injury, a lesser-included charge of domestic abuse assault by strangulation resulting in bodily injury.[1]

At sentencing, the State recommended consecutive terms of incarceration; Cameron requested a deferred judgment and probation. In the presentence investigation report (PSI), the PSI preparer reported that, when giving his version of the events, Cameron "still den[ied] any physical assault ever took place." Cameron admitted to only "a nasty text argument that led to a verbal one." The State offered and the court admitted a Facebook post from Cameron from the day after the verdict was rendered. Cameron wrote: "Now accepting all the Laughing emojis.. Thank you to everyone who has continued to support me thru this circus. I thank god! They slandered me for 7 months, now it's time for TRUTH. I'm home." (Punctuation as in original.)

The court sentenced Cameron to five years of imprisonment on the assault-causing-serious-injury conviction and one year of imprisonment on the domestic abuse assault causing bodily injury conviction, to be served concurrently. It also required that Cameron complete the domestic abuse intervention program and Iowa domestic assault intervention program. In imposing the sentences, the court explained:

> I've also considered that you've not accepted responsibility for your actions. The jury found that you committed an assault, which is a specific intent crime. You do not admit to that. The nature of the offense is serious. It required specific intent. And a serious injury is

---

[1] The willful injury causing serious injury charge merged into the assault causing serious injury conviction.

one which creates a substantial risk of death or causes permanent disfigurement or extended loss or impairment of the function of any bodily part or organ. I've considered those factors . . . .

Cameron appeals.

## II. Discussion.

Cameron only challenges the sufficiency of the evidence supporting his conviction for assault causing serious injury,[2] the admission of expert testimony on domestic abuse dynamics at trial, and his sentences. We address Cameron's evidentiary challenge first.

### A. Expert Testimony.

Next, Cameron asserts that the testimony by Bowden-Fuentes was irrelevant and, even if relevant, should have been excluded as unfairly prejudicial. He also argues that the district court abused its discretion in admitting the evidence as it did not engage in any balancing of this prejudice against its probative value when making its ruling admitting the evidence. "We review evidentiary rulings for an abuse of discretion. An abuse of discretion occurs when a district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Wilson*, 878 N.W.2d 203, 210–11 (Iowa 2016) (internal citation omitted).

---

[2] Although Cameron does not challenge the domestic abuse assault causing bodily injury conviction, to find Cameron guilty of that charge, the jury had to conclude

       1. . . . Cameron did an act which was meant to cause pain or injury to [Trisha].

       2. . . . Cameron had the apparent ability to do the act.

       3. . . . Cameron's act caused a bodily injury to [Trisha].

       4. The act occurred between family or household members who resided together at the time of the incident.

"Generally, we have been committed to a liberal view on the admissibility of expert testimony." *Ranes v. Adams Lab'ys, Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). To determine if the expert testimony is admissible, we consider, first, whether the testimony "'will assist the [jury]' in understanding 'the evidence or to determine a fact in issue'" and, second, whether the witness is qualified to testify as an expert based on "knowledge, skill, experience, training, or education." *Id.* (quoting Iowa R. Evid. 5.702). Cameron does not dispute that Bowden-Fuentes was an expert based on sufficient knowledge, skill, experience, training, or education. Instead, he focuses his argument on her testimony being unnecessary to assist the jury.

As our supreme court has acknowledged, "[d]omestic violence is never a single isolated incident. Rather, domestic violence is a pattern of behavior, with each episode connected to the others." *State v. Taylor*, 689 N.W.2d 116, 128 n.6 (Iowa 2004) (quoting Jane H. Aiken & Jane C. Murphy, *Evidence Issues in Domestic Violence Civil Cases*, 34 Fam. L.Q. 43, 56 (2000)). So, the information was also helpful for the jury in understanding the elements involved with the domestic-abuse-assault charge. Likewise, in a prosecution for first-degree murder—like the prosecution here—expert testimony on domestic abuse generally can assist the fact finder in determining the state of the mind of the defendant and thus is helpful to the jury. *See State v. Newell*, 710 N.W.2d 6, 28 (Iowa 2006) (holding that an understanding of the domestically abusive relationship between the defendant and the victim "was essential to the jury's ability to determine [the defendant's] state of mind on the night of [the decedent's] death and what might have motivated him to beat and strangle her"); *State v. Rodriquez*, 636 N.W.2d

234, 246 (Iowa 2001) (finding no abuse of the district court's discretion in allowing expert testimony on domestic abuse and battered women's syndrome because it "allowed the jury to view both the defendant's and the victim's behavior in the context of the nature of their relationship"). Thus, Bowden-Fuentes's testimony here was relevant to help the jury understand a material issue of the first-degree-murder charge and the necessary state of mind the State had to prove. That the jury ultimately acquitted him of that charge does not make the evidence unhelpful; in contrast, it may have been the basis for his acquittal.

Additionally, the district court limited the testimony to only general concepts of domestic abuse, and thus, it was not unfairly prejudicial to Cameron because Bowden-Fuentes did not testify about him, Trisha, or their relationship. Rather, Bowden-Fuentes testified that she had no knowledge about Trisha, Cameron, or their families, social life, physical health, mental health, financial situation, or religion. Instead, she testified about domestic abuse in general, and it was for the jury to determine whether that general information even applied to Cameron and his relationship with Trisha.

Although we do not have the benefit of the district court's balancing analysis regarding the probative value and the risk of unfair prejudice of the evidence, we do not find Bowden-Fuentes's testimony to be unfairly prejudicial to Cameron given the general nature of the subject matter coupled with the supporting firsthand testimony related to the incidences of domestic abuse from eyewitnesses. *See* Iowa R. Evid. 5.403 (permitting the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of" unfair prejudice, among other things); *Newell*, 710 N.W.2d at 28–29 (explaining that because the expert

did not ever testify that the decedent was in fact a victim of domestic violence, "[t]hat determination was left to the jury" and any prejudice to the defendant would be based on the jury's determination the expert's testimony about domestically violent relationships applied). The court did not abuse its discretion in admitting Bowden-Fuentes's testimony. Regarding the court's failure to conduct the necessary, applicable balancing test, to the extent the court did abuse its discretion by failing to conduct the test, we conclude any error was harmless—the probative value of Bowden-Fuentes's testimony was not substantially outweighed by a danger of unfair prejudice. *See State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004) (discussing that evidentiary errors only require a new trial when a substantial right of the defendant was affected by the error). This does not entitle Cameron to a new trial. *See id.*

**B. Sufficiency of the Evidence—Assault Causing Serious Injury.**

First, Cameron argues that the evidence is insufficient to prove he committed an act that caused a serious injury to Trisha. To limit the analysis, Cameron contends that the only serious injury was the spinal and skull fractures and that the State did not prove the broken kneecap fit the definition of a serious injury. Then, he asserts that because the jury acquitted him of first-degree murder and did not find him guilty of any offense that required a finding he forced Trisha to fall causing the serious injury, the jury must have rejected that he forced Trisha to fall from the balcony. And because the elements of assault causing serious injury "did not necessarily involve physical contact between Cameron and [Trisha]," the State failed to show Cameron "*caused*" the serious injuries Trisha sustained through his verbal or physical actions. In his view, the only path to his conviction

for assault causing serious injury was if the State could show that his actions or words inside the apartment caused Trisha to go accidentally fall off the balcony or commit suicide by jumping. And as he describes it, the jury found that "Cameron only intended to 'cause pain or injury' or put [Trisha] 'in fear of an immediate physical contact which would have been painful, injurious, insulting or offensive' to [her]." He maintains the evidence could not show the causal connection of his actions to the serious injury.

With his focus on proof of causation, on appeal, Cameron asks us to apply the causation analysis found in the Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (Am. L. Inst. June 2024 update), which provides that when examining factual causation, the fact finder considers whether "the harm would not have occurred absent the conduct" of the actor. Cameron did not ask for a causation instruction that would have instructed the jury on the Restatement language he now offers, so we do not consider Cameron's causation argument because of the lack of record made below and because the unchallenged instructions that were given are the law of the case.[3] *See State v. Schiebout*, 944 N.W.2d 666, 671 (Iowa 2020) (providing that when there are no objections to the jury instructions, they become the law of the case for purposes of our review of the record for sufficiency of the evidence).

We review the sufficiency of the evidence supporting convictions for correction of errors at law. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022).

---

[3] In the record made involving the instructions, we do note that Cameron did object to the submission of the felony murder charge on the basis of sufficiency of the evidence.

We affirm when the verdict is supported by substantial evidence, meaning "the quantum and quality of evidence is sufficient to 'convince a rational fact finder that the defendant is guilty beyond a reasonable doubt.'" *State v. Banes*, 910 N.W.2d 634, 637 (Iowa Ct. App. 2018) (citation omitted). In conducting our review, we consider the evidence in the light most favorable to the verdict, including all reasonable inferences that may be fairly drawn from the evidence. *Id.*

We turn to the unchallenged jury instructions. To find Cameron guilty of assault causing serious injury, the jury had to conclude:

> 1. . . . Cameron did an act which was specifically intended to cause pain or injury or specifically intended to place [Trisha] in fear of immediate physical contact which would have been painful, injurious, insulting or offensive to [her].
> 2. [Cameron] had the apparent ability to do the act.
> 3. [Cameron's] act caused a serious injury to [Trisha].

*Accord* Iowa Code § 708.2(4). As it was instructed, the jury also had to find that—regarding a serious injury—Cameron's act caused "a disabling mental illness, condition which cripples, incapacitates, weakens or destroys a person's normal mental functions or bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or extended loss or impairment of the function of any bodily part or organ." Two alternatives for potential serious injury were included in the marshalling instruction for first-degree murder: (1) forcing Trisha to fall from a third-floor balcony or (2) striking her kneecap. Cameron did not object to the instruction that described these two alternatives.

As a preliminary matter, Cameron argues that the only serious injury that the jury could have based its verdict on was the fall from the balcony, and now on appeal, contends that the injury to Trisha's kneecap was not a serious injury, thus

should not have been considered. That argument was never made below and was not mentioned in the record made on the motions for judgment on acquittal or part of any objection to the jury instructions. Likewise, Cameron did not argue the knee injury was not a serious injury under the law during his closing arguments. Instead, Cameron's focus at trial related to lack of proof that he caused the knee injury, even so, we review the sufficiency of the evidence on direct appeal not withstanding any failure to preserve error in the district court. *See State v. Crawford,* 972 N.W.2d 189, 202 (Iowa 2022).

From our view, there is substantial evidence to support the jury concluding that Cameron either pushed Trisha off the balcony or struck her kneecap, shattering it. The State relied upon these alternative theories to reach a conviction and "we are required to affirm if at least one of the alternatives presented to the jury is supported by substantial evidence." *State v. Triplett*, No. 19-1902, 2021 WL 3074475, at *1 (Iowa Ct. App. July 21, 2021) (relying on Iowa Code § 814.28). Pivoting to the injuries that resulted in Trisha's death, Cameron acknowledges that trauma to the head and spine were serious but emphasizes the evidence does not prove he caused those injuries. But the jury heard from multiple medical experts that Trisha's injuries were inconsistent with an intentional jump. Instead, the injuries demonstrated that she hit the ground with her back first—not her feet or the top of her head, as the experts noted was usually the case when a person jumps rather than being pushed. Likewise, she had other injuries that were inconsistent with only the fall: wounds on her hands and feet, broken fingernails, and a rug burn on her arm. The jury could have relied on this evidence to find that

Cameron caused either the injuries from the fall and Trisha did not intentionally jump or attempt suicide.

In addition, the jury also could have factored in multiple inconsistencies in Cameron's story in determining his guilt: while Cameron testified that Trisha landed with her leg folded underneath her, when officers arrived her legs were straight out; Cameron denied moving her body yet she had grass and dirt on her front side while the impact injuries were to her back side, and he was the only person with Trisha before law enforcement arrived. Cameron vacillated between saying he saw Trisha jump, he saw her walk onto the balcony, and he only heard her scream while he remained in the bathroom. He maintained that she had thrown her computer at him; law enforcement found no damage to the computers in the apartment. Similarly, Cameron testified that Trisha was drinking vodka straight from the bottle, but law enforcement did not find a vodka bottle. He originally told law enforcement that he arrived home around 8:00 p.m., but security camera footage showed him parking Trisha's car at 10:38 p.m.

The jury also could have considered that, when officers searched the apartment—which had been secured since they first responded to the 911 call—the screen and glass sliding doors to the balcony were closed and the shade was lowered to the point that it would have blocked someone from walking through. Yet Cameron did not mention seeing Trisha duck underneath the shade, lower it after she was on the balcony, or close either sliding door, and he did not say that he did so himself. As another consideration, Cameron had Trisha's phone, which he used to call 911 and Trisha's parents; yet he kept the phone for two days and deleted his text conversation with her before surrendering it. And although

Cameron claimed that he called 911 immediately after finding Trisha on the ground, evidence demonstrated that he waited seven minutes and called and spoke with his friend on Snapchat before doing so.

"[A] defendant's false story to explain or deny a material fact against him is by itself an indication of guilt and is relevant to show that the defendant fabricated evidence to aid his defense." *State v. Bloom*, 983 N.W.2d 44, 50 (Iowa 2022) (cleaned up); *accord State v. Little*, No. 19-1062, 2021 WL 1400068, at *9 (Iowa Ct. App. Apr. 14, 2021) (noting a jury could properly infer guilt based upon actions, such as making inconsistent statements). While Cameron insisted that he did nothing to Trisha and they were only involved in a verbal argument, the jury "was free to discount that testimony based on its inconsistency with other evidence and [Cameron's] interest in the trial." *State v. Jenkins*, No. 21-1718, 2023 WL 4759448, at *6 (Iowa Ct. App. July 26, 2023). For these reasons, we find that the guilty verdict for assault causing serious injury is supported by substantial evidence.

**C. Sentence.**

Lastly, Cameron challenges his sentences imposed, arguing the court abused its discretion because it considered the fact that Cameron did not accept responsibility for his actions. He points out that he only admitted that he and Trisha had a verbal altercation with no intent to seriously injure her and he asserts his version at trial comported with what the jury found—an "assault causing serious injury but without the *intent* to cause a serious injury." But the State pointed out at sentencing that Cameron never admitted he assaulted Trisha at any time or caused her to suffer a serious injury, so his version did not align with the jury verdict. And as the State argued to the district court at sentencing, once released

from jail, Cameron posted on his Facebook page that "he's now accepting all laughing emojis and that he believes he was subjected to seven months of slander."

While Cameron argues that the jury's verdicts did not require that it find he physically touched Trisha, that is not so. The jury here found Cameron guilty of both assault causing serious injury and domestic abuse assault causing bodily injury. Both of those convictions required a showing that Cameron caused physical injury to her—both a serious injury and a bodily injury. And the serious injury must have comprised "a disabling mental illness, condition which cripples, incapacitates, weakens or destroys a person's normal mental functions or bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or extended loss or impairment of the function of any bodily part or organ." Neither charge involved merely a verbal altercation or nasty text argument. Thus, Cameron did fail to accept responsibility for his actions here, given that he insisted that he never committed any physical assault of Trisha. Instead, he reduced his actions to a nasty text and a verbal battle.

"[T]he decision of the district court to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). To establish an abuse of discretion, the defendant bears the burden to affirmatively show that the district court relied on improper factors or clearly untenable grounds. *State v. Sailer*, 587 N.W.2d 756, 759, 762 (Iowa 1998). Here, the district court considered Cameron's age and employment, criminal history, mental-health and substance-

abuse needs, and that he had "loving and supportive family." But it also examined the nature of the offense, the community's need for protection, the maximum opportunity for rehabilitation, and Cameron's version of the incident contained in the PSI report, where he denied any assault occurred. Along with Cameron's lack of acceptance of responsibility, these factors are all reasonable and proper for the court to consider. *See State v. West Vangen,* 975 N.W.2d 344, 355 (Iowa 2022) (noting a lack of remorse or responsibility is highly pertinent to evaluating the need for rehabilitation). For these reasons, the court correctly concluded that Cameron did not accept responsibility for his actions, and it did not abuse its discretion in factoring this consideration into determining his sentence.

**III. Conclusion.**

Because the verdict for assault causing serious injury is supported by substantial evidence that Cameron either caused Trisha to fall from the balcony—fracturing her skull and spine—or hit her, breaking her kneecap, the district court did not abuse its discretion in allowing testimony on domestic abuse dynamics to assist the jury in understanding the first-degree murder charge of which Cameron was eventually acquitted, and the district court did not abuse its discretion in considering that Cameron failed to accept responsibility for physically assaulting Trisha when imposing his sentences. Because the district court did not abuse its sentencing discretion, we affirm.

**AFFIRMED.**