**IN THE COURT OF APPEALS OF IOWA**

No. 25-1501
Filed December 17, 2025

**IN THE INTEREST OF H.W. and D.D.,**
**Minor Children,**

**K.W., Father of H.W.,**
        Appellant,

**C.W., Father of D.D.,**
        Appellant,

**M.S., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Korie Talkington,

Judge.

        A mother and the fathers of two children separately appeal termination of

their parental rights.  **AFFIRMED ON ALL THREE APPEALS.**

        Jennifer Margret Triner Olsen, Davenport, for appellant father K.W.

        Barbara E. Maness, Davenport, for appellant father C.W.

        Steven W. Stickle of Stickle Law Firm, P.L.C., Davenport, for appellant

mother.

        Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney

General, for appellee State.

        Christine D. Frederick of Zamora, Taylor & Frederick, Davenport, attorney

and guardian ad litem for minor children.

        Considered without oral argument by Chicchelly, P.J., and Buller and

Langholz, JJ.

**BULLER, Judge.**

The mother of two children—a male child, D.D., born in 2014 and a female child, H.W., born in 2018—appeals the termination of her parental rights. Each child has a different father, and those fathers also separately appeal termination of their parental rights. On our de novo review, we affirm.

## I. Background Facts and Proceedings

The family first came to the attention of the Iowa Department of Health and Human Services (HHS) in 2022 when D.D.'s custodian died; the mother could not be located, and D.D.'s father was incarcerated. After locating the mother, HHS became concerned about the mother and H.W.'s father using controlled substances, as well as H.W.'s general living situation. HHS's primary concern with all three parents has been ongoing methamphetamine abuse.

As the juvenile court noted, "[t]hese cases have exhaustive histories" and initially were separate but eventually combined, which is how they reach us on appeal. Given the length and complexity of the proceedings, we address only the pertinent facts in this opinion. Suffice to say for our purposes, both children were found to be children in need of assistance (CINAs) and have been placed in foster care since 2023. Each child's case was continued at least once to allow the parents additional time.

All three parents have shown periods of sobriety (or at least non-detectable use) and participated to some degree in substance-abuse treatment; they have also all experienced months-long relapses. Most concerning, the mother and H.W.'s father have both continued to deny using methamphetamine despite repeated positive test results. And while the mother has a slightly longer history

of testing negative than H.W.'s father, she has stayed with him despite him testing positive for methamphetamine repeatedly while she was allegedly sober. D.D.'s father had his parole revoked for substance abuse, admitted to past methamphetamine use, and declined or no-showed for his most recent testing appointments.

At one point in early 2024, the mother showed sufficient sobriety that both children were temporarily returned to her custody. But when H.W.'s father tested positive for methamphetamine and the mother exhibited behavioral indicators of use, HHS implemented a safety plan and eventually removed the children again. The children were then placed together in a foster home.

More recently, the mother and H.W.'s father continued to live together and were consistent in attending fully-supervised visits with the children. HHS largely did not have concerns about visits, other than a few occasions when workers suspected they saw behavioral indicators that the mother had started using drugs again. The children's guardian ad litem (GAL) was somewhat concerned that the mother and H.W.'s father only wanted to visit with both children jointly and were not willing to attend visits with the children separately.

Over the life of the case, D.D.'s father has cycled in and out of incarceration for drug-related charges. And, as discussed above, he has not demonstrated sobriety as of the termination trial. He was also largely disengaged from services. As part of her report, the children's GAL explained that she did not believe D.D.'s father had shown sobriety, did not believe him to be an appropriate placement, and did not think he was "truly interested in becoming one."

D.D., now ten years old, refused visits with his father in the months preceding termination, sometimes accompanied by outbursts. HHS encouraged the child to attend visits but without success. Consistent with this, the child's therapist and another provider reported that the child shut down whenever they tried to discuss his father, the child's GAL reported that the child described the father as "really mean," and the child told his court appointed special advocate (CASA) he didn't like and didn't want to see his father. D.D.'s father was not allowed to call the child because he made inappropriate statements to him in the past and has also threatened to call the police on the foster parents if they didn't let him speak with the child whenever he wanted. And D.D.'s father has come to visits unprepared, which upset the child. As of trial, D.D.'s father was once again incarcerated.

Evidence adduced at trial, as well as the GAL's report, shows the children are both doing well in their foster home, which is willing to serve as a long-term placement. As of trial, they had been removed from their parents for almost two and a half years aside from a brief trial home visit. The foster placement informed the court at trial they intended to allow parental contact even after termination, so long as it was positive experience for the children. And the GAL opined that this was consistent with the children's wishes.

None of the three parents testified at the termination trial. The majority of the trial record concerns two toxicologists: Dr. Leo Kadehjian (who everyone called "Dr. Leo" below) for the State and Dr. Sol Bobst for the mother. Both are independent toxicologists, though their specific qualifications differ.

Dr. Leo has focused his forty-year career on drug testing, previously oversaw drug testing for the federal court system, and taught at the National Judicial College. He is familiar with the sweat-patch manufacturer at issue in this case (including their laboratory procedures and visiting their lab). He testified as to the accuracy and reliability of sweat-patch testing if the testing is done in compliance with established protocols. He testified that claims about sweat patches being contaminated by exposure to drugs through casual contact or in the air are not realistic or supported by scientific evidence. And he was confident that none of the lawful drugs these parents were taking would cause false-positive test results for methamphetamine. He also explained that it was not inconsistent for a person who tests positive for methamphetamine by sweat patch to sometimes test negative in their urine, because methamphetamine has a short half-life and is excreted out of the body within a few days after use, while the patch is usually worn for one to two weeks. In Dr. Leo's expert opinion, the test results in this case reflected repeated methamphetamine use by the mother and H.W.'s father. He wasn't asked about D.D.'s father, presumably due to his refusal to test for HHS.

Dr. Bobst is also a toxicology consultant, is an adjunct professor, and has his own business. His testimony was generally critical of the reliability of drug testing and highlighted different ways tests could be contaminated or otherwise become unreliable.

The juvenile court credited and accepted Dr. Leo's testimony. The court found Dr. Bobst was a qualified expert in the area of toxicology generally but not sweat patches specifically, and that he lacked familiarity with the particular manufacturer and laboratory at issue in this case. For this reason, the court

excluded a portion of Bobst's testimony in which he opined that the sweat patch testing in this case was unreliable based in part on the patches being worn for longer than a week and the negative urine samples. But, even after giving his opinion by offer of proof, Dr. Bobst could not rule out that the basis of the parents' positive test results was their intentional consumption of methamphetamine.

The county attorney, HHS, the children's GAL, and the CASA all recommended termination of parental rights. The court terminated the mother's parental rights under Iowa Code section 232.116(1)(f) and (*l*) (2025); H.W.'s father's rights under the same sections; and D.D.'s father's parental rights under Iowa Code section 232.116(1)(c), (e), (f), and (*l*). The three parents separately appeal, and we review their claims de novo. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

## II.     Discussion

The three parents at issue in this appeal raise sometimes overlapping claims, which we address under the appropriate substantive headings below. At some points in the briefing, one or more of the parents seem to purport to raise claims on behalf of the other. This is not permitted, and we do not consider any arguments one parent advances on behalf of another. *See In re D.G.*, 704 N.W.2d 454, 460 (Iowa Ct. App. 2005).

### A. Sufficiency of the Evidence

When the juvenile court terminates parental rights on more than one statutory ground, we are permitted to affirm if any ground is adequately supported by the record. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). Here we focus our review on Iowa Code section 232.116(1)(f) for simplicity. We do not consider the

statutory grounds supporting termination of D.D.'s father because he does not raise such a challenge on appeal. *See, e.g.*, *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

The portion of the mother's petition challenging sufficiency of the evidence under (f) only seems to challenge reasonable efforts. While section 232.116(1)(f) "invoke[s] a requirement of reasonable efforts by [HHS]," we address the issue under a separate heading in this opinion. *See In re L.T.*, 924 N.W.2d 521, 527–28 (Iowa 2019). To the extent the mother's petition presents any other challenge to (f), the best we can discern would be a challenge to whether the child could safely return to her custody as of trial. *See In re L.A.*, 20 N.W.3d 529, 532–33 (Iowa Ct. App. 2025) (en banc) (analyzing this element of the statutory ground). We agree with the juvenile court that the mother's substance-abuse history, as well that of H.W.'s father, bodes poorly for the safety of the children in the shared home. As does her failure to progress beyond fully-supervised visits. *See In re L.H.*, 13 N.W.3d 627, 629 (Iowa Ct. App. 2024), *abrogated in part on other grounds by L.A.*, 20 N.W.3d at 534–35. The mother has not meaningfully acknowledged her methamphetamine addiction, instead unsuccessfully challenging the validity of the sweat-patch test results through a less-than-persuasive expert witness. Absent acknowledgement of her addiction, we are not convinced the mother has meaningfully treated it, and the hazards methamphetamine addiction poses to the children persist. And even if she could maintain sobriety, continuing her relationship with H.W.'s father indicates, as the GAL put it, that the mother essentially "picked [her relationship with H.W.'s father] over her children."

The juvenile court also terminated the parental rights of H.W.'s father under section 232.116(1)(f). He also urges the child could be safely returned as of trial, though even in his appellate briefing he continues to deny that he has a methamphetamine addiction despite testing positive for the substance within about six months of trial—and throughout the life of the case. His child could not return to his care for the same reasons we have already discussed with regard to the mother, with the addition of this father's more-recent relapse.

In short, we commend both of these parents for their periods of sobriety. But the relapsing nature of their methamphetamine addiction remains unresolved, and they were not safe custodians for the children as of trial. *Cf. W.M.*, 957 N.W.2d at 313 (affirming termination where a parent "engaged in a cycle of abusing drugs, getting clean, relapsing, seeking treatment, and again abusing drugs").

## B. Reasonable Efforts

Although the mother complains about reasonable efforts in her petition on appeal, we doubt she preserved error on such a claim below. But even if she did, it is not entirely clear to us what additional efforts she believes HHS should have provided beyond scheduling more visits sooner. We take as undisputed for purposes of this analysis that the mother attended nearly all of her available visits with the children and that they went well. But more visits would not have changed the course of this termination proceeding; the mother's deficiencies related primarily to substance abuse, not visit attendance. And, in any event, we do not fault HHS for taking a cautious approach to increasing visits and decreasing supervision, given the mother's substance-abuse history and that of H.W.'s father (so long as he continued to live with the mother).

As for D.D.'s father, we understand his claim to urge that HHS should have done more to rebuild his relationship with the child. But the record provides ample evidence that, despite HHS encouraging D.D. to have contact with his father, the child was unwilling, sometimes violently resisting. This was evidenced by the child repeatedly shutting down when asked about the father and the child's therapist opining it would not be a net positive for the father to participate in counseling sessions. HHS is not required to increase contact between a parent and a child when doing so is contrary to the child's best interest. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996) ("[T]he nature and extent of visitation is always controlled by the best interests of the child. This standard may warrant limited parental visitation." (citation omitted)). And, like the mother, more visitations would not have changed the outcome of D.D.'s father's case given his substance-abuse problems and general nonengagement with services.

## C. Best Interests

In its responsive brief, the State urges that all three parents have failed to adequately brief a best-interests issue for our court to resolve on appeal. We assume without deciding that the issue was adequately presented and address the merits.

In evaluating best interests, we give "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). Under this framework, we agree with the juvenile court that removal of both children and termination of all three parents' rights is in the children's best interests. They deserve stability and permanency, in a home

with sober and dependable caregivers—like the foster placement with whom they now reside. None of the three parents is a suitable custodian, and D.D.'s father has virtually no relationship with the child, in large part as a consequence of his own actions (including incarceration and inappropriate behavior related to phone calls). We affirm the juvenile court's best-interests determination.

### D. Permissive Exceptions[1]

The mother and H.W.'s father both urge on appeal that termination should be thwarted by the permissive bond exception codified at Iowa Code section 232.116(3)(c). The State contests error preservation, noting the parents did not urge the application of this exception below. We assume without deciding error was preserved, and we affirm the juvenile court's decision not to prevent termination on this basis. While we agree there is evidence of both of these parents' bond with the children, the need for permanency and stability outweigh any detriment that flows from termination, especially considering the cyclical nature of the parents' addiction. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (noting we consider the parent-child bond in the context of a case's unique circumstances and the child's best interests).

### E. Expert Testimony

The mother argues the district court's exclusion of a portion of Dr. Bobst's testimony was an abuse of discretion and violated her due process rights under the state and federal constitutions. But the mother did not make any argument

---

[1] The mother's petition also includes a cursory reference to placement in a guardianship. We conclude this claim is both unpreserved and inadequately briefed, and we address it no further.

regarding either constitution below, so no constitutional issue is before us on appeal. At most, we are left with a challenge under the Iowa Rules of Evidence, which we review for abuse of discretion.

Iowa generally follows a liberal standard for the admissibility of expert testimony. *E.g.*, *Ranes v. Adams Lab'ys, Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). But this approach also grants broad discretion to the district court in ruling on admissibility. *Id.* We reverse "only when the record shows the court exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable," meaning the ground or reason "is not supported by substantial evidence or . . . is based on an erroneous application of the law." *Id.* (cleaned up). Against this highly deferential standard, we find the mother's claim fails.

As noted above, only a tiny fraction of Dr. Bobst's testimony was excluded—the part particular to the reliability of sweat-patch testing. The district court found that his general expertise in toxicology did not extend to the sweat patches here in part because he lacked familiarity with the manufacturer and laboratory at issue. This is a reasonable concern about the foundation underlying that aspect of Dr. Bobst's testimony. And while some courts may have found that concern went more toward weight than admissibility, we do not find the juvenile court abused its discretion in finding that portion of the proffered testimony inadmissible.

Last, even if we found the juvenile court should have considered the excluded portion, we would find any resulting error harmless, given Dr. Bobst's lack of familiarity with the laboratory and manufacturer and his admission that his opinions were all consistent with the results being valid depictions of these parents' ongoing methamphetamine use.

### III. Disposition

We affirm the juvenile court's ruling in all respects.

**AFFIRMED ON ALL THREE APPEALS.**